PEOPLE v MARTIN

Docket No. 43943. Submitted June 27, 1980, at Detroit.—Decided
August 25, 1980.

Lee E. Martin, Jr., was convicted of two counts of armed robbery
and was sentenced to prison on both counts, St. Joseph Circuit
Court, Robert E. A. Boyle, J. He appeals, alleging that the
initial stop of his automobile violated his Fourth Amendment
right against unreasonable searches and seizures, that the trial
court erred in concluding, following a hearing to determine the
voluntariness of certain statements made by defendant, that he
was properly advised of and subsequently waived his rights
*against self-incrimination, that he was coerced during interro-*
gation into making an inculpatory statement, and that the trial
court erred in denying his motion for disqualification of the
trial judge. *Held:*

1. The initial investigatory stop of defendant's automobile
without probable cause was reasonable in light of the time,
location, and general physical attributes of the defendant.
Defendant consented to a search of his car after being advised
of his rights, and the subsequent search revealed evidence
which provided probable cause for his arrest.

2. The trial record indicates that the defendant was advised
of his rights prior to his arrest and each interrogation session,
and his assertion that he did not understand those rights is not
supported by the record. Thus, the trial court was justified in
concluding that his confession was voluntary, and, absent a
showing that its ruling was clearly erroneous, its finding will
not be reversed.

3. The trial record does not support defendant's contention
that he was coerced into making an inculpatory statement.

4. The trial court did not abuse its discretion in denying
defendant's motion for disqualification of the trial judge since it
was not timely made, and defendant demonstrated no preju-

REFERENCES FOR POINTS IN HEADNOTES
[1-4] 68 Am Jur 2d, Searches and Seizures §§ 43, 45, 99.
[5] 29 Am Jur 2d, Evidence § 590.
[6] 46 Am Jur 2d, Judges § 202.

dice-in-fact by the trial court's decision to sit as the trier of fact.

Affirmed.

1. CRIMINAL LAW — INVESTIGATORY STOPS — PROBABLE CAUSE.

A police officer may make an initial investigatory stop of a suspect with less than probable cause where he observes unusual conduct which leads him to reasonably conclude, in light of his experience, that criminal activity may be taking place.

2. CRIMINAL LAW — INVESTIGATORY STOPS — SEARCHES — TEST.

Reasonableness determined from the facts and circumstances of a case is the test that is to be applied for both the stop of and search of moving motor vehicles, and fewer foundation facts are necessary to support a finding of reasonableness where moving vehicles are involved than a house or a home, and a stop of a motor vehicle for investigatory purposes may be based upon fewer facts than those necessary to support a finding of reasonableness where both a stop and search are conducted by the police.

3. CRIMINAL LAW — INVESTIGATORY STOPS — STANDARD.

The reasonableness of an investigatory stop of an automobile is judged on an objective standard which hinges upon whether specific, articulable facts, together with rational inferences from those facts, reasonably warrant the stop.

4. CRIMINAL LAW — INVESTIGATORY STOPS — PROBABLE CAUSE.

Probable cause is not the predicate for an investigatory stop of an automobile.

5. CRIMINAL LAW — CONFESSIONS — VOLUNTARINESS — ERROR.

Great deference will be given on appeal to a trial court's finding of voluntariness of a defendant's confession following a *Walker* hearing, since the trial court is in the best position to judge the relative credibility of witnesses; the Court of Appeals will not upset the trial court's ruling unless it is clearly erroneous.

6. MOTIONS AND ORDERS — DISQUALIFICATION OF A TRIAL JUDGE — ERROR.

A trial court, in deciding a motion for disqualification of a trial judge, must carefully balance the logistical problems in the production of witnesses, preparation for trial, and court time lost against a defendant's diligence in bringing forward the motion and its merits, and a denial of an untimely motion does not constitute error, where a defendant demonstrates no preju-

dice-in-fact resulting from the court's decision to sit as the trier of fact.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *James Noecker,* Prosecuting Attorney, for the people.

*William D. Weltz,* for defendant on appeal.

Before: J. H. GILLIS, P.J. and V. J. BRENNAN and A. C. MILLER,* JJ.

A. C. MILLER, J. Defendant was convicted in a bench trial of two counts of armed robbery, MCL 750.529; MSA 28.797, and was sentenced to 9 to 18 years imprisonment on each count. Defendant appeals as of right.

On March 24, 1978, at about 3:30 p.m., a man wearing a hard-hat helmet and glasses and armed with a sawed-off shotgun robbed the Mendon, Michigan branch of the American National Bank and Trust Company. The manager of the bank identified the defendant as the robber and stated that, as defendant gathered money from two teller cages, he also took some bait money and a "Security-Pac"[1] from a teller's drawer which activated a surveillance system of cameras and an alarm at the sheriff's department. The manager looked out the front window and saw defendant fleeing in a tan car, going north. Identification was made by the bank manager and by ten-year-old Sheli Weinberg, whose mother's car was taken by defendant —with Sheli and her brother in it—to drive from the post office to the bank. Sheli said defendant went into the bank and came out with a white bag

---

* Circuit judge, sitting on the Court of Appeals by assignment.

[1] A "Security-Pac" apparently is a device that emits red dye and pungent red gas when triggered.

containing a red, smoke-like substance and a bad odor. He then drove them to the corner and got out. Sheli's mother had left the car running in front of the post office and, upon emerging, saw it in front of the bank. She arrived at the car just after defendant and futilely grabbed the door handle as he drove off. She recruited another car and driver to pursue and saw defendant walking across the street, but as they approached, he put the gun to her head, told the occupants to get out, and drove away with this car. It was found two miles away with its engine running.

A detective with the Three Rivers Police Department had been listening to the radio traffic with regard to the bank robbery in Mendon. He positioned his squad car at the intersection of Buckhorn and Moorepark roads, since he knew this intersection covered the most direct route between the rural communities of Mendon and Three Rivers. The perpetrator of the robbery had been described as a Negro male who was slim in build and short, 5'2" to 5'3". The perpetrator was also reported possibly to be wearing an olive drab military jacket and glasses. The detective had heard two different automobile descriptions but was later informed that the suspect was either on foot or in a third car. Four or five minutes later, the detective observed a light-colored Cadillac coming from the direction of Mendon, heading toward Three Rivers. He identified the defendant as the driver of the automobile. The detective recognized the defendant, although he could not remember from where. Defendant was not wearing glasses or an army jacket and was accompanied by another young black male. The detective pulled his squad car in front of defendant's automobile, and defendant stopped. The detective ordered the defendant

out of his car, and he complied. The detective noticed a red stain on defendant's pants. The defendant was read his rights, signed a rights form, and, according to the detective, consented to a search of his automobile. The rights form was signed and dated 4:09 p.m., March 24, 1978. Defendant stated that he was coming from Three Rivers and had just cashed a check. A search of defendant's automobile revealed a napkin and several bills stained with a red dye. The defendant was then arrested. The detective conceded that he did not have "probable cause" to stop the defendant's car.

Defendant was taken into custody and was questioned by two FBI agents, who also advised him of his rights. The interrogation by the FBI ended at 7:48 p.m. Defendant was questioned again on March 25, 1978, advised of his rights, and, after being shown photographs of himself taken by the bank cameras, told the questioning officers that he had committed the robbery. He led the officers to the robbery money and the shotgun used in the robbery. The money taken from the robbery was found to be heavily stained with a red dye.

On appeal, defendant contends that the initial stop of his vehicle violated his right to be free of unreasonable searches and seizures as guaranteed by the Fourth Amendment to the United States Constitution. If every such stop had to be predicated upon probable cause, we would agree with defendant and reverse his conviction. However, the Supreme Court in *Terry v Ohio,* 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968), held that when an officer observes unusual conduct which leads him to reasonably conclude, in light of his experience, that criminal activity may be taking place, he may make an initial investigatory stop of the suspect.

The Supreme Court in *Adams v Williams,* 407 US 143, 145; 92 S Ct 1921; 32 L Ed 2d 612 (1972), expanded upon the principle that an investigatory stop may take place with less than probable cause. The Supreme Court stated:

"The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response."

The requirements for an investigatory stop of an automobile were outlined by Michigan's Supreme Court in *People v Whalen,* 390 Mich 672, 682; 213 NW2d 116 (1973). The Supreme Court adopted the following four rules:

"1. Reasonableness is the test that is to be applied for both the stop of, and the search of moving motor vehicles.
"2. Said reasonableness will be determined from the facts and circumstances of each case.
"3. Fewer foundation facts are necessary to support a finding of reasonableness when moving vehicles are involved, than if a house or a home were involved.
"4. A stop of a motor vehicle for investigatory purposes may be based upon fewer facts than those necessary to support a finding of reasonableness where both a stop and a search is conducted by the police."

The rules adopted by the Supreme Court must, of their nature, be applied on a case-by-case basis. *People v Lillis,* 64 Mich App 64; 235 NW2d 65 (1975). Reasonableness of the stop is judged on an objective standard which hinges upon whether specific, articulable facts, together with rational

inferences from those facts, reasonably warrant the stop. *Lillis, supra, People v Hunter,* 72 Mich App 191; 249 NW2d 351 (1976). A review of other cases where automobile stops were made on less than probable cause is in order.

In *Whalen, supra,* the police were advised of a robbery and were directed to watch for a large white car with three dark-complected occupants, one of whom was wearing a tan jacket. Two Michigan State Policemen observed a white Continental traveling toward the Ohio border. Pulling alongside the vehicle, they observed the driver to be dark-complected and wearing a tan jacket. Applying their own rules, the Supreme Court held that the subsequent stop was reasonable since the driver, his apparel, and the car matched the given descriptions. The car was traveling on a freeway frequently used by criminals fleeing to another state.

In *People v Parisi,* 393 Mich 31; 222 NW2d 757 (1974), the Supreme Court reached the opposite conclusion where the officer's reasons for stopping the car were the slow speed of the automobile and the apparent youth or illness of the driver.

In *Lillis, supra,* this Court held that an investigatory stop of an automobile was reasonable. The police believed that an escapee was riding in the stopped automobile. The police could not positively identify the escapee, but an occupant of the automobile met his general description. The car stopped was known by the police to be used by a motorcycle club of which the escapee was a member. The stop was made in the city where the club was based. This Court held the limited intrusion outweighed by the reasonableness of police activity in stopping the car.

In *Hunter, supra,* this Court again held that a

stop was reasonable in a situation where the police knew that a motel robbery occurred and that two black males were involved. The defendant's car was stopped a short time after the robbery and a short distance from the motel. The defendants were traveling in a direction opposite the scene of the crime. The passenger in the automobile turned around in his seat to watch the police after the defendant's car had passed by. This Court stated:

"In stopping the defendants, the officers were seeking to maintain the status quo. Their intrusion upon the liberty of the defendants was tapered to the circumstances of the case. Only a brief detention and questioning was originally intended." 72 Mich App 191, 199.

Finally, in *People v Bloyd,* 96 Mich App 264; 292 NW2d 546 (1980), this Court again upheld the stop of an automobile where the police observed defendant's automobile leaving a parking lot of a closed business in the early morning hours. This Court held that the police acted reasonably in stopping defendant to question him concerning his "oddly timed departure". See also, *People v Carter,* 96 Mich App 694; 293 NW2d 681 (1980), *People v Grimmett,* 97 Mich App 212; 293 NW2d 768 (1980).

Under the circumstances of this case, we find the stop of defendant's automobile reasonable in balance with the limited intrusion the stop entailed. The detective of the Three Rivers Police Department who stopped defendant's automobile was aware that a Mendon bank had just been robbed. He positioned his squad car in a rural area at an intersection through which one leaving the Mendon vicinity was likely to pass. After a very short time, he observed the defendant's car approach and recognized him. While the defendant was no longer wearing glasses, a hard-hat, or an

army jacket, he did match the physical description given of the perpetrator, *i.e.* a black male, small in stature. We find that these specific, articulated facts, when coupled with the inferences they fostered, made the detective's acts reasonable for purposes of an investigatory stop.

We note that the detective testified that he did not have "probable cause" for the stop. As previously mentioned, probable cause is not the predicate for an investigatory stop. Additionally, the standard used to assess the specific, articulated facts in any particular factual situation is an objective standard. *Lillis, supra.* In the case at bar, the time, location, and general physical attributes of the defendant made the investigatory stop of his vehicle reasonable.

We further note that once defendant stopped and exited from his vehicle, the red dye stain left by the bank "Security-Pac" was clearly visible. The defendant was advised of his rights and consented to a search of his car. The subsequent search revealed both a paper napkin and paper currency stained with the same red dye. At this point, probable cause to arrest defendant existed.

Defendant contends that the trial court erred by concluding, following a *Walker*[2] hearing, that defendant was properly advised of, and subsequently waived, his *Miranda*[3] rights. This Court gives great deference to a trial court's finding of voluntariness following a *Walker* hearing since the trial court is in the best position to judge the relative credibility of witnesses. *People v Smith,* 80 Mich App 106; 263 NW2d 306 (1977). This Court will not upset the lower court's ruling unless it is clearly erro-

[2] *People v Walker (On Rehearing),* 374 Mich 331; 132 NW2d 87 (1965).

[3] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

neous. *People v McGillen #1,* 392 Mich 251; 220 NW2d 677 (1974), *People v Arthur Burton,* 74 Mich App 150; 253 NW2d 691 (1977).

Upon reviewing the record as a whole, we remain unconvinced that the lower court clearly erred in its holding. The record indicates that the defendant was advised of his rights prior to his arrest and prior to each interrogation session. The defendant's assertion that he did not understand those rights is not supported on the record. The trial court was justified in concluding that the defendant was "selective" concerning what he remembered regarding being informed of his rights.

Defendant also asserts that the county sheriff who was present during defendant's interrogation made false promises to defendant to induce an inculpatory statement. We disagree. The sheriff told defendant that it would be of benefit to him to cooperate. This can hardly be considered a coercive promise. Furthermore, this occurred after his initial confession to the FBI. See *People v Morgan Clark,* 68 Mich App 674; 243 NW2d 914 (1976).

Defendant lastly argues that the trial judge should have disqualified himself pursuant to the motion filed by the defendant on the day of defendant's trial. We disagree. GCR 1963, 912.3(a) provides:

"To avoid delaying trial and inconveniencing the witnesses, a motion to disqualify must be filed within 10 days after a case has been assigned to a judge for trial or at least 10 days before the trial date, whichever is earlier. If a motion is not timely filed, untimeliness, including delay in waiving jury trial, is a factor in deciding whether the motion should be granted."

The trial court correctly found defendant's motion untimely under the above rule. Defendant

argues that his motion for disqualification was not untimely since a jury trial was waived only a week before trial was scheduled to commence. Still, defendant does not offer a satisfactory reason for delaying his motion until the morning of trial.

In deciding a motion for disqualification, a trial court must carefully balance the logistical problems in the production of witnesses, the preparation for trial, and the court time lost against the defendant's diligence in bringing forward his motion for disqualification and the merits for that motion. In the case at bar, the trial court did not abuse its discretion in denying the motion for disqualification and proceeding to trial. Defendant's motion came exceedingly late. Defendant demonstrated no prejudice-in-fact by the trial court's decision to sit as the trier of fact. *People v Lobsinger,* 64 Mich App 284; 235 NW2d 761 (1975), *People v Gibson (On Remand),* 90 Mich App 792; 282 NW2d 483 (1979). While the trial court had been exposed to certain portions of the preliminary examination during defendant's pre-trial motion to dismiss, the trial court did not consult the preliminary examination while sitting as the trier of fact. Thus, the "absolute rule" of *People v Ramsey,* 385 Mich 221, 225; 187 NW2d 887 (1971), was not violated. Rather, he did so pursuant to the defendant's motion to dismiss and with defense counsel's full acquiescence. Defendant waived his right to a jury trial *after* the trial court ruled on defendant's motion to dismiss. *People v Dixson,* 403 Mich 106; 267 NW2d 423 (1978).

Defendant additionally argues that the trial judge should have been disqualified since the judge was privy to a pre-trial conference at which defendant offered to plead guilty to certain charged

offenses. Defendant does not demonstrate how he was prejudiced by this fact. See *People v Koss,* 86 Mich App 557; 272 NW2d 724 (1978), *People v Rider,* 93 Mich App 383; 286 NW2d 881 (1979). Under these circumstances, the trial court did not err in refusing defendant's untimely motion for disqualification.

Affirmed.