PEOPLE v WARD

Docket No. 49763. Submitted March 5, 1981, at Lansing.—Decided June 4, 1981. Leave to appeal applied for.

Michael C. Ward was charged with conspiracy to deliver cocaine. Prior to trial, defendant moved to quash the information, to quash search warrants, and to suppress certain evidence. Following a hearing, the Ingham Circuit Court, James R. Giddings, J., granted defendant's motion to suppress the evidence and ordered the charges dismissed. The prosecution appeals. *Held:*

1. The investigatory stop by police of defendant's automobile was reasonable under the circumstances of the case, and thus evidence acquired as a result of the stop was admissible. The trial court erred in suppressing the evidence.

2. Defendant had no reasonable expectation of privacy in the driveway of another person, and therefore the use of a telephoto lens by police to enhance the officer's observation of

REFERENCES FOR POINTS IN HEADNOTES

[1-3] 58 Am Jur 2d, Searches and Seizures § 58.
  Validity, under Federal Constitution, of warrantless search of automobile. 46 L Ed 2d 209.
[3] 68 Am Jur 2d, Searches and Seizures § 42.
[4, 10, 14] 29 Am Jur 2d, Evidence §§ 415, 416.
  Modern status of rule governing admissibility of evidence obtained by unlawful search and seizure. 50 ALR2d 531.
[5] 62 Am Jur 2d, Privacy §§ 4, 26.
  68 Am Jur 2d, Searches and Seizures §§ 2, 4.
  Right of privacy. 14 ALR2d 750.
[6] 68 Am Jur 2d, Searches and Seizures § 25.
  Observation through binoculars as constituting unreasonable search. 48 ALR2d 1178.
  Investigations and surveillance, shadowing and trailing, as violation of right of privacy. 13 ALR3d 1025.
[7] 62 Am Jur 2d, Privacy § 26.
[8, 9, 10, 14] 68 Am Jur 2d, Searches and Seizures §§ 64, 66-68.
  Disputing matters stated in supporting affidavit. 5 ALR2d 394.
[11, 12] 29 Am Jur 2d, Evidence §§ 418-424.
  Nature and interest in, or connection with, premises search as affecting standing to attack legality of search. 78 ALR2d 246.
[13] 25 Am Jur 2d, Drugs, Narcotics, and Poisons §§ 7, 17.

defendant did not constitute a search without a warrant. The trial court erred in discounting evidence obtained as a result of the observation.

3. The trial court erred in failing to apply the proper standard in determining whether probable cause existed to search defendant's automobile.

4. The evidence discovered by police in a conspirator's home was not the fruit of the search of defendant's car. The trial court erred in so holding.

5. The trial court erred in holding that defendant had standing to challenge the search of a conspirator's house. Defendant had no reasonable expectation of privacy in the house or the objects seized.

6. The trial court properly held that the search of the conspirator's house was illegal, but defendant had no right to be protected from the search and may not vicariously assert the right.

7. The provisions of the Public Health Code which proscribe use of controlled substances and provide penalties therefor do not violate the title-object clause of the Michigan Constitution.

Reversed and remanded.

M. F. CAVANAGH, P.J., dissented. He would hold that even though defendant did not have standing to challenge the search and seizure of a conspirator's house, the trial court had the power and duty to exclude evidence obtained as a result of the search by police by means which were shocking to the conscience on due process grounds. In addition he would hold that the investigatory stop of defendant's automobile was unreasonable. He would remand the case to the trial court for further hearings on the conduct of police in obtaining the search warrant in light of the proper standard for determining probable cause to issue the warrant.

OPINION OF THE COURT

1. SEARCHES AND SEIZURES — AUTOMOBILES — INVESTIGATORY STOPS — POLICE.

A stop and subsequent search by police of a motor vehicle must be reasonable as determined from the facts and circumstances of each case; fewer foundation facts are necessary to support a finding of reasonableness where moving vehicles are involved than where the search is of a house or a home, and where the stop is for investigatory purposes it may be based upon fewer facts than would be necessary to support a finding of reasonableness where both a stop and a search is conducted.

2. SEARCHES AND SEIZURES — AUTOMOBILES — INVESTIGATORY STOPS.

A person's unusual, although not illegal, activity may provide a reasonable basis for a subsequent stop by police of his motor vehicle; it is not necessary that the police have sufficient evidence to believe that a crime has been committed.

3. CRIMINAL LAW — INVESTIGATORY STOPS — PROBABLE CAUSE — ARREST.

Police officers, in appropriate circumstances and in an appropriate manner, may approach a person for the purpose of investigating possible criminal behavior even where there is no probable cause to make an arrest.

4. CRIMINAL LAW — INVESTIGATORY STOPS — EVIDENCE.

Information acquired as a result of a reasonable, investigatory stop of a person may be introduced as evidence during a trial of the person.

5. SEARCHES AND SEIZURES — CONSTITUTIONAL LAW — INVASION OF PRIVACY.

A search must invade a person's reasonable expectation of privacy to violate protections guaranteed by the Fourth Amendment.

6. SEARCHES AND SEIZURES — CONSTITUTIONAL LAW — TELEPHOTO LENSES — INVASION OF PRIVACY.

The use of a telephoto lens to enhance a police officer's observation of a person's activities outside a residence does not constitute a violation of Fourth Amendment protections.

7. SEARCHES AND SEIZURES — REASONABLE EXPECTATIONS OF PRIVACY.

A person may have a reasonable expectation of privacy in secluded areas outside the four walls of his home, but where he conducts activities within the view of passersby and neighbors no such expectation exists.

8. SEARCHES AND SEIZURES — SEARCH WARRANTS — SUPPORTING AFFIDAVITS — PROBABLE CAUSE.

An affidavit which supports a search warrant is presumed to be valid, and a challenge of the affidavit must allege deliberate falsehood or reckless disregard for the truth, accompanied by an offer of proof; where such allegations are substantially shown to be true and are necessary to a finding of probable cause, a hearing must be held at the challenger's request, and where the allegations are subsequently established by a preponderance of the evidence and, with the affiant's false material set aside, the affidavit's remaining content is insufficient to

establish probable cause, the search warrant must be voided and the fruits of a search made pursuant to the warrant excluded.

9. SEARCHES AND SEIZURES — SEARCH WARRANTS — SUPPORTING AFFIDAVITS — PROBABLE CAUSE.

An innocent or negligent mistake in an affidavit supporting a search warrant is insufficient to justify the setting aside of the erroneous information in determining probable cause to issue the warrant.

10. SEARCHES AND SEIZURES — SEARCH WARRANTS — EVIDENCE.

Evidence obtained by methods which violate constitutional proscriptions must be excluded from use in criminal prosecutions along with the fruits of evidence so obtained, and where tainted information constitutes more than a very minor portion of the information in an affidavit supporting a search warrant, the warrant is invalid.

11. SEARCHES AND SEIZURES — STANDING.

A person, to have standing to contest a search and seizure must be on the premises searched at the time of the search and seizure, must allege a proprietary or possessory interest in the premises or the objects seized, or must be charged with an offense which includes possession of the seized evidence at the time of the search and seizure as an essential element of the offense.

12. SEARCHES AND SEIZURES — STANDING — CONSPIRATORS.

The right not to be subjected to unreasonable searches and seizures is a personal right and cannot be asserted vicariously by a third party, including a conspirator, who does not possess a reasonable expectation of privacy in the premises searched.

13. HEALTH — PUBLIC HEALTH CODE — CRIMINAL LAW — CONTROLLED SUBSTANCES — CONSTITUTIONAL LAW — STATUTES.

Sections of the Public Health Code which provide proscriptions and penalties for the use of controlled substances do not violate the title-object clause of the Michigan Constitution (Const 1963, art 4, § 24, MCL 333.1101 *et seq.*; MSA 14.15[7101] *et seq.*).

DISSENT BY M. F. CAVANAGH, P.J.

14. SEARCHES AND SEIZURES — STANDING — DUE PROCESS — EVIDENCE — PUBLIC POLICY.

*Courts have the power and duty to exclude evidence obtained by means which shock the conscience on due process grounds, and*

*where a defendant lacks standing to challenge a search and
seizure but can establish that police obtained a search warrant
by offering an affidavit containing a deliberate falsehood and
that the police acted in purposeful disregard of the law with
the deliberate intention of building a case against him a trial
court should exclude any product of such illegal action as a
matter of public policy and as a deterrence to future illegal
action by the police.*

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, *Peter D. Houk,*
Prosecuting Attorney, and *Charles M. Sibert,* Chief
Appellate Attorney, for the people.

*Terence R. Flanagan,* Assistant State Appellate
Defender, for defendant on appeal.

Before: M. F. CAVANAGH, P.J., and J. H. GILLIS
and ALLEN, JJ.

PER CURIAM. The prosecution appeals from a
January 30, 1980, order of the Circuit Court for
Ingham County dismissing a charge of conspiracy
to deliver cocaine, MCL 750.157(a); MSA 28.354(1)
and MCL 333.7401(1); MSA 14.15(7401). The order
was entered when, following a three-day hearing,
the circuit court granted defendant's pretrial mo-
tions to quash the information, to quash search
warrants, and to suppress evidence.

Testimony revealed that on the afternoon of
March 20, 1979, Miklos Szilagyi, a Lansing police
officer assigned to the Metro Narcotics Squad and
investigator for the Ingham County Citizens Grand
Jury, drove to the house of Randall Lee Seaver at
830 Lake Lansing Road. There he observed defen-
dant drive a white Pontiac, which was later deter-
mined to be a rented vehicle, into Seaver's drive-
way. Defendant left the car, entered the house,
then returned, opened a suitcase in the trunk of

the car, and removed something from the suitcase. Defendant placed something in his jacket, closed the suitcase, then the trunk, and returned to the house. Defendant left the house a few moments later and drove away.

A surveillance team of the Metro Squad followed defendant to an address on Pine Tree Road. There, defendant talked on the front porch for a while, entered the house, remained for about 20 minutes, and then drove to a gas station where he made a telephone call from a phone booth. He then returned to the Pine Tree Road house, remained inside for another 20 minutes, then drove to another pay phone booth, and made another phone call. The surveillance team lost track of the defendant's car but located it again later at Seaver's house.

Later that day, defendant was followed as he drove southeastward for approximately 50 miles. Near Milford, not far from the intersection of M-59 and US-23, the surveillance team spoke to a state trooper, indicating that they wanted defendant's car stopped to ascertain his identity. A trooper pulled the car over. Defendant showed him a driver's license which indicated that his name was Kenneth Watson of Plantation, Florida. The defendant said that he worked for a travel agency and was on his way to the airport to catch a plane. Defendant was released, and no traffic citation was issued. The trooper later told a narcotics squad officer that the stop was made because defendant had made an illegal turn.

The surveillance team continued to follow defendant but ended surveillance for the day after they observed defendant sitting in a parked car, reading a road map.

One member of the surveillance team, Officer

Boyd of the Tri-County Metro Narcotics Unit, checked with the rental agency and determined that the car had been leased by Kenneth Watson of Plantation, Florida. The next morning, Officer Boyd ran a LEIN check and learned that Watson had been arrested after one pound of cocaine was seized from him, but the case had been dismissed. Police also learned that a man who was killed in an apparently drug-related homicide had placed a call shortly before his death to the Pine Tree Road residence that defendant visited on March 20.

On the afternoon of the following day, March 21, the surveillance team again spotted defendant's car parked in the driveway at Seaver's home. Observation of the house and car was made by Officer Szilagyi from the vantage point of a neighbor's yard, some 125 feet away. From this location, Szilagyi took pictures using two different camera lenses, a 300 mm and 200 mm lens. His observations were in turn relayed by radio to Officer Boyd who was sitting in his car in a 7-11 parking lot a short distance from Seaver's house. Boyd received a radio message from Szilagyi that defendant had just emerged from the Seaver residence carrying a clear glassine baggie the size of several hot dogs containing white powder and that defendant had climbed into the car trunk and was hiding the baggie in the trunk liner. Eight photographs were taken and introduced into evidence at the suppression hearing. They showed defendant climbing into the car trunk but did not show a glassine package.

Via radio, Boyd then asked Szilagyi whether he "felt certain about what he had seen". Szilagyi replied that he did and added that defendant was just driving away. Boyd followed. When defendant turned into a gas station at the intersection of Lake Lansing and Abbott Roads, Boyd pulled his

car in front of defendant's, exited from his car
with his gun drawn and ordered defendant out of
defendant's car. When defendant got out of his car,
Boyd searched him and told him that he was
under arrest for violation of the controlled sub-
stances act. This was about 3 p.m. No cocaine was
found in defendant's possession. The car was then
towed to the East Lansing police station, and the
trunk was opened and searched after a warrant
for search of the car was secured at about 6:28
p.m. Some Quaaludes and white note paper were
found in the upper portion of the trunk, but no
cocaine or glassine packet was discovered. Mean-
while, and before a warrant was obtained for
search of the Seaver house, police entered the
house at about 3:30 p.m. There they made plain-
view observations of items in the house and de-
tained Seaver and his girlfriend for approximately
five hours while they waited for a search warrant.
While waiting, the police officers found cocaine
and related paraphernalia in one bedroom. In a
dresser drawer, which they said was pulled out,
they observed a bank bag containing 25 small
glass vials holding pills. In an open footlocker,
they saw two, clear gallon-sized baggies containing
psilocybin mushrooms. During the waiting period,
the officers field tested the cocaine and took photo-
graphs. After the search warrant arrived, police
completed the search of the Seaver house within
minutes.

In a 52-page opinion delivered verbally from the
bench on November 29, 1980, the trial court
granted defendant's motion to suppress the evi-
dence on the following grounds: (1) the police made
an improper pretext stop of defendant on March
20, near the intersection of US-23 and M-59 near
Milford; (2) the observations of defendant through

a 300 mm lens from a neighbor's yard were inadequate to support a finding of probable cause for defendant's arrest; (3) because the affidavit in support of the warrants to search defendant's car and the Seaver residence relied on Officer Szilagyi's positive assertion that defendant hid a bag of white powder in his car and a subsequent extensive search failed to uncover the bag, the warrants to search were invalid; and (4) the evidence seized at Seaver's residence pursuant to the search warrants was the fruit of the poisonous tree. As articulated by the trial judge:

"What we're really talking about is a search here that is intimately related to, at least, two prior unlawful intrusions into the defendant's person and into his automobile, and that it was those intrusions that—as a matter of fact, it's the alleged possession of the cocaine and the glassine packet with the white powder that caused the prosecuting attorney, apparently, to suggest that they secure the house, on the basis upon which they entered the house and observations made of the defendant and items which were alleged to be in his possession. They cannot be separated. So I think that the intrusion into the house must be viewed in light of the prior ongoing transactions.

\* \* \*

"What I suggest that we really got here is a fruit of the poison tree. So the standing, although I'm satisfied that under all the circumstances there is standing, I'm not sure that it's even required because of the source of the information which lead to the seizure of the house.

\* \* \*

"In this particular case, without the unlawful stop at Milford, Michigan, the identity of this defendant could not have been known, and the only way it was was that stop coupled with the illegal arrest at the gas station at Abbott Road and Lake Lansing Road."

The propriety of each of the trial court's grounds

for suppression of evidence is discussed in the balance of this opinion.

## I. *The alleged pretext stop.*

At the suppression hearing, Officer Boyd testified that Metro Narcotics Squad officers asked a state trooper to pull over defendant's car in order to learn defendant's identity. He also stated that the trooper claimed that he stopped defendant for failing to signal a turn. This testimony was greeted by laughter in the courtroom. No evidence was presented that a citation was issued for an improper turn or for any violation. Relying largely on the fact that no citation was issued, the trial court found that the stop was a pretext stop.

Though the prosecution argues on appeal that the stop was made because the trooper observed an illegal turn, we cannot fault the trial judge for concluding that no illegal turn was made and thus the stop was a pretext stop. However, the fact that no violation occurred does not render the stop and the information as to defendant's identity obtained therefrom invalid. The stop may be validated as a *Terry-*[1]*Whalen* type investigatory stop. In *People v Whalen,* 390 Mich 672, 682; 213 NW2d 166 (1973), our Supreme Court set forth a four-pronged test to determine the reasonableness of an investigatory stop:

"1. Reasonableness is the test that is to be applied for both the stop of, and the search of moving motor vehicles.

"2. Said reasonableness will be determined from the facts and circumstances of each case.

"3. Fewer foundation facts are necessary to support a

---

[1] *Terry v Ohio,* 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968).

finding of reasonableness when moving vehicles are involved, than if a house or a home were involved.

"4. A stop of a motor vehicle for investigatory purposes may be based upon fewer facts than those necessary to support a finding of reasonableness where both a stop and a search is conducted by the police."

We find that at the time the defendant was stopped for investigatory purposes the police had adequate grounds for making such a stop. They had observed the defendant at the house of a suspected large-scale cocaine dealer. They had witnessed the defendant carrying something into that house, and they had observed the defendant as he made telephone calls from various pay phones. It was unnecessary that the officers have sufficient evidence to believe that a crime had been committed. As was stated in *People v Olson*, 98 Mich App 207, 211; 296 NW2d 218 (1980), defendant's unusual though not illegal activity provided a reasonable basis for a subsequent stop of defendant's vehicle "even though the officers did not have sufficient evidence to believe that a crime had been committed".

In *People v Bloyd*, 96 Mich App 264, 267; 292 NW2d 546 (1980), this Court upheld an investigatory stop where the sole ground for stopping was that the defendant's automobile was seen leaving the parking lot of a place of business in the early morning hours. The Court said:

"Defendant first challenges the legality of the police officer's stop. Police officers may 'in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest'. *Terry v Ohio*, 392 US 1, 22; 88 S Ct 1868; 20 L Ed 2d 889 (1968). *Stops may be made to determine a person's identity, Adams v Williams*, 407

US 143, 146; 92 S Ct 1921; 32 L Ed 2d 612 (1972), or to obtain information on crimes. *Id., People v DeFillippo,* 80 Mich App 197, 202; 262 NW2d 921 (1977), *rev'd on other grounds* 443 US 31; 99 S Ct 2627; 61 L Ed 2d 343 (1979), *People v Jeffries,* 39 Mich App 506, 511; 197 NW2d 903 (1972)." (Emphasis supplied.)

See also *People v Martin,* 99 Mich App 570; 297 NW2d 718 (1980). Since the stop was reasonable, the identity of the defendant and the knowledge that defendant had been arrested in Florida on a cocaine charge should not have been suppressed.

## II. *Observations made with a telephoto lens.*

On appeal, defendant argues that observations made by Officer Szilagyi from the neighbor's yard 125 feet from the Seaver residence through a telephoto lens constituted a search without a warrant. While this objection was not raised at the suppression hearing, the trial judge did discount the evidence for the reason that he could "not believe that an observation [made] from 125 feet through a telephoto camera, or otherwise, gives probable cause". No Michigan court has discussed whether the use of telephoto lenses, binoculars, or telescopes violates the right to be free from unreasonable searches.[2] However, the decision of whether such observations violate Fourth Amendment protections depends upon whether the person being observed had a reasonable expectation of privacy. In order for the constitutional protections to apply, a defendant must show that a search

---

[2] In *People v Beavers,* 393 Mich 554, 580; 227 NW2d 511 (1975), Chief Justice COLEMAN, dissenting, indicated that participant monitoring was no worse than viewing a premises through binoculars. In *United States v Lee,* 274 US 559, 563; 47 S Ct 746; 71 L Ed 1202 (1927), the Court stated: "Use of a search light is comparable to the use of a marine glass or field glass. It is not prohibited by the Constitution."

invaded his reasonable expectation of privacy. *Katz v United States,* 389 US 347; 88 S Ct 507; 19 L Ed 2d 576 (1967). Where a telephoto lens has been used to view activities outside a residence, other courts have found no error. *United States v Gibson,* — US App DC —; 636 F2d 761 (1980), *United States v Allen,* 633 F2d 1282 (CA 9, 1980), *United States v Minton,* 488 F2d 37, 38 (CA 4, 1973), *United States v Grimes,* 426 F2d 706 (CA 5, 1970).

We observe that a defendant may have a reasonable expectation of privacy in secluded areas outside the four walls of his home. Where a defendant conducts activities that are within the view of passersby and neighbors, we find that no reasonable expectation of privacy exists. In the instant case, defendant's car was parked in the driveway of Seaver's home where it could be seen and photographed from a neighbor's house. Thus, the neighbor could have made the same observations. Accordingly, we find that no reasonable expectation of privacy existed and that the use of the telephoto lens to enhance the viewing officer's observations was not violative of defendant's rights. We also note that a 200 mm lens gives a magnification of approximately four power, thus equating the observation to an observation made without magnification from a distance of 31 or 32 feet.

III. *Alleged invalidity of the search warrants.*

A. *Search of car.*

The key issue at both the preliminary examination and the suppression hearing concerned Officer Szilagyi's statement that he had observed defendant carrying a glassine baggie the size of several

hot dogs containing white powder and had seen him concealing the package in the trunk of his car. The trial court observed:

"It was clear in this case that the observations of the glassine packet with the white powder the size of several hot dogs did not exist.

                    *    *    *

"So far as I'm concerned, this was erroneous information, and although the magistrate did not know it, he's not entitled to consider it, and without it the warrant on its face must fall.

"I am not prepared to say today and there is no necessity for the court today to get into a question of whether there was indeed deliberate falsehood or reckless disregard of the truth. I don't need to do that because I don't think that that's a standard to be applied. If an appellate court decides that it is, then this court will at that point consider whether there was such reckless disregard or deliberate falsehood in this case. But I decline to do that because of the court not needing to, and that generally being the policy, the courts will not address those issues where there is no necessity to do so.

"That affidavit is insufficient to give the right to have access to the automobile and the warrant must be quashed and the evidence seized as the result thereof may not be received into evidence."

The court did not determine whether the officer's information was given in reckless disregard of the truth or was an intentional misrepresentation.

The standards for determining whether erroneous information in an affidavit for a search warrant should be excluded in determining whether probable cause existed to issue the search warrant were set out in *Franks v Delaware,* 438 US 154, 155-156; 98 S Ct 2674; 57 L Ed 2d 667 (1978). The *Franks* court stated:

"[W]e hold that, where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit."

The court later explained:

"There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. *There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.* They should point out specifically the portion of the warrant affidavit that is claimd to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. *Allegations of negligence or innocent mistake are insufficient.* The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant." *Id.,* 171. (Emphasis supplied.)

Our Supreme Court has suggested that *Franks* now controls in Michigan. It remanded the case in *People v Price,* 406 Mich 881; 279 NW2d 293 (1979), to the Court of Appeals for reconsideration

in light of *Franks.* On remand, this Court applied
*Franks* and held that a showing of an innocent or
negligent mistake was insufficient to set aside the
erroneous information in an affidavit. *People v
Price (On Remand),* 91 Mich App 328, 331; 283
NW2d 736 (1979). The *Franks* rule was also ap-
plied in *People v Poindexter,* 90 Mich App 599,
605; 282 NW2d 411 (1979).

The trial court did not hold the standard set
forth in *Franks, supra,* is controlling but gra-
ciously observed that "[i]f an appellate court de-
cides that it is, then the court will at that point
consider whether there was such reckless disre-
gard or deliberate falsehood * * *".[3] In our opin-
ion, the trial court erred in not applying the
*Franks* standard. However, we temporarily with-
hold decision as to reversal or other appropriate
remedial action until we have determined the
propriety of the search of the Seaver home.

## B. *Search of the Seaver home.*

The trial court found that the search of the
Seaver residence at 830 Lake Lansing Road was
improper on the dual grounds (a) that the affidavit
in support of the search basically repeats the same
allegations found insufficient to support a warrant
for the search of the car and (b) that until the
warrant arrived five hours later, there was no
right to enter the house, make observations, or
field test substances found therein. For the reasons
set forth in part IIIA, *supra,* we disagree with the
trial court that the affidavit supporting the war-
rant for the search of the home was insufficient.
We agree with the trial court's finding that with-

---

[3] The trial court relied on the earlier cases of *People v Brolio,* 58
Mich App 547; 228 NW2d 456 (1975), and *People v Staffney,* 70 Mich
App 737; 246 NW2d 364 (1976), stating that they expressed "the more
sound reasoning". But as noted earlier, the Supreme Court appears to
have held that *Franks* controls.

out a warrant entry into the home was illegal. Entry was made during business hours on a weekday when a magistrate reasonably was available. Police gave no indication of exigent circumstances which would justify an entry without a warrant. Defendant's arrest some 30 minutes earlier at the gas station was not observable from the home, and thus persons in the home would have no reason to destroy any drugs contained therein. Seaver and his girlfriend were sequestered without warrants for their arrest for five hours while officers roamed the house at will. Similar conduct was soundly condemned in *United States v Marshall,* 488 F2d 1169 (CA 9, 1973), and *People v Summers,* 407 Mich 432; 286 NW2d 226 (1979). However, the prosecution challenges the defendant's standing to attack the search of the Seaver residence. Because any decision on the issue of standing is interrelated with the question of whether the trial court erred in concluding that the cocaine and drug paraphernalia seized in the Seaver home was the fruit of the poisonous tree, the standing issue is discussed in the following portion of this opinion.

IV. *Fruit of the poisonous tree.*

Under the exclusionary rule, evidence obtained by methods violating constitutional proscriptions is excluded from use in criminal prosecutions. *Mapp v Ohio,* 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961), *People v Pennington,* 383 Mich 611, 619-620; 178 NW2d 471 (1970). Fruits of evidence so obtained are excluded as well. *Wong Sun v United States,* 371 US 471; 83 S Ct 407; 9 L Ed 2d 441 (1963). Where tainted information constitutes "more than a very minor portion" of the information in an affidavit supporting a search warrant,

the warrant is invalid. *United States v Langly,* 466 F2d 27, 35 (CA 6, 1972).

The trial court held that the cocaine found in Seaver's home and Seaver's testimony against defendant at the preliminary examination[4] were basically the product of two unlawful intrusions of defendant's privacy: the pretext stop on March 20, from which the police learned for the first time the name, address, and age of defendant and from which information the police were able to run a LEIN check and ascertain that defendant had been arrested for possession of cocaine in Florida, and the observation through the telescopic lens that defendant had concealed a glassine packet containing white powder in the trunk of his car. We disagree for four reasons. First, as we have already stated in part I of this opinion, the stop of defendant's car was a justifiable *Terry-Whalen* investigatory stop. Second, as determined in part II of this opinion, observations made through the telescopic lens were not unlawful intrusions into defendant's privacy. Third, defendant's car was not searched until two hours after the police had entered the home,[5] and thus it is error to claim that the search of defendant's car precipitated the search of the house. Fourth, the items seized in the home were taken before the search warrant

[4] The people called Randall Seaver as their first witness at the preliminary examination. He stated that he was testifying pursuant to a plea bargain that charges of conspiracy to deliver cocaine and possession of cocaine would be dropped if he testified as to his dealings with defendant. He then stated that on several occasions defendant had brought cocaine to the house at 830 Lake Lansing Road and that on March 21, 1979, defendant had brought one-half pound to the house in two plastic bags and that he then paid defendant for the cocaine.

[5] Defendant was arrested at approximately 3 p.m., and the car was towed to the police garage pending issuance of a search warrant for the search of the trunk. The Seaver home was entered at about 3:30. The warrant for search of the car was issued at 6:28, and the search of Seaver's home was conducted at about 8:30.

for the house was issued several hours later. Additionally, it should be noted that no cocaine was found in the trunk of the car. Thus, the search was not the product of any prior illegal search, and defendant's claim that the search was the product "of the poisonous tree" must fall.

In the absence of a showing that the search of the home without a warrant was the fruit of any prior illegal conduct *against the defendant,* defendant must demonstrate standing to challenge the search. Standing has been defined by our Court as follows:

"The test for determining standing is summarized in *Brown v United States,* 411 US 223, 229; 93 S Ct 1565; 36 L Ed 2d 208 (1973), as follows:

" '[T]here is no standing to contest a search and seizure where, as here, the defendants: (a) were not on the premises at the time of the contested search and seizure; (b) alleged no proprietary or possessory interest in the premises; and (c) were not charged with an offense that includes, as an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure.'

"A defendant need only qualify under one of the three sections to contest a search. *People v Ray Jackson,* 71 Mich App 487, 489; 247 NW2d 382 (1976), *People v Morgan Clark,* 68 Mich App 674, 692; 243 NW2d 914 (1976) (NOBLE, J., dissenting). Yet, as *Brown, supra,* indicates, defendant must normally demonstrate some legitimate interest in the premises searched or the objects seized, *United States v Hunt,* 505 F2d 931, 939-940 (CA 5, 1974), *cert den* 421 US 975; 95 S Ct 1974; 44 L Ed 2d 466 (1975), and such inquiry has characteristically turned on the scope of defendant's 'reasonable expectations of privacy'." *People v Greenwood,* 87 Mich App 509, 512-513; 274 NW2d 832 (1978).

Except for staying overnight on one occasion early

in 1979, defendant had no possessory interest in the Seaver home. He had never lived in the house or paid rent. Further, he was not at the premises when the search was conducted.

In *Rakas v Illinois,* 439 US 128, 143; 99 S Ct 421; 58 L Ed 2d 387 (1978), the United States Supreme Court held that Fourth Amendment rights are personal rights and cannot be asserted vicariously by a third party who does not possess a reasonable expectation of privacy. The *Rakas* test of standing has been adopted in Michigan. *People v Mack,* 100 Mich App 45, 47; 298 NW2d 657 (1980). The old "automatic standing" rule announced in *Jones v United States,* 362 US 257; 80 S Ct 725; 4 L Ed 2d 697 (1960), and followed by one panel of this Court in *People v Godwin,* 94 Mich App 286, 288, fn 1; 288 NW2d 354 (1979), was recently overruled in *United States v Salvucci,* 448 US 83, 95; 100 S Ct 2547; 65 L Ed 2d 619 (1980).

"As in *Rakas,* we find that the *Jones* standard 'creates too broad a gauge for measurement of Fourth Amendment rights' and that we must instead engage in a 'conscientious effort to apply the Fourth Amendment' by asking not merely whether the defendant had a possessory interest in the items seized, *but whether he had an expectation of privacy in the area searched.* Thus neither prosecutorial 'vice', nor the underlying assumption of *Jones* that possession of a seized good is the equivalent of Fourth Amendment 'standing' to challenge the search, can save the automatic standing rule." (Emphasis added.)

Our final reason for holding that defendant is without standing to challenge the search and seizure in the instant case is that defendant is not charged with possession of cocaine but with conspiracy to deliver that narcotic. Coconspirators have been held to possess no special standing.

*Alderman v United States,* 394 US 165, 172; 89 S
Ct 961; 22 L Ed 2d 176 (1969), *People v Atkins,* 96
Mich App 672, 678; 293 NW2d 671 (1980). Conse-
quently, even though the police violated Seaver's
Fourth Amendment right, defendant Ward is with-
out standing to challenge the violation.

## V. *In summation.*

At this point it will be helpful to summarize our
findings and to state whether or not the trial court
erred in dismissing the charge of conspiracy to
deliver cocaine. In our opinion, the trial court
erred in finding: (1) that the police made an *illegal*
pretext stop of defendant on March 20, 1979; (2)
that the enhanced view through a camera lens
could not be used to support a finding of probable
cause for defendant's arrest; (3) that it was unnec-
essary for the court to follow the standard set
forth in *Franks, supra,* and to determine whether
the police acted in reckless disregard of the truth
in making the affidavits in support of the warrant
to search defendant's car; (4) that the evidence
seized at the Seaver house was the fruit of the
poisonous tree; and (5) that defendant had stand-
ing on Fourth Amendment grounds to contest the
search and seizure at the Seaver home. The trial
court did not err when it found that the search
without a warrant of the Seaver home was an
illegal act. However, because the right to be pro-
tected from such unlawful searches is a personal
right which may not be asserted vicariously by a
third party who does not possess a reasonable
expectation of privacy, *Rakas, supra,* the evidence
seized should not have been suppressed in the
instant case. Accordingly, we reverse and remand
the case to the trial court for trial on the merits.

## VI. *Constitutionality of the Public Health Code of 1978.*

On appeal, defendant contends that in the event this Court finds that the trial court erred in quashing the search warrants and suppressing evidence, the charge against defendant should be dropped because the Public Health Code, 1978 PA 368; MCL 333.1101 *et seq.;* MSA 14.15(7101) *et seq.,* violates the title-object clause of the Michigan Constitution, Const 1963, art 4, § 24. Defendant's argument has recently been before this Court in *People v Trupiano,* 97 Mich App 416, 420; 296 NW2d 49 (1980), *lv den* 409 Mich 895 (1980). In *Trupiano,* this Court found that the Public Health Code did not embrace more than a single object. We now hold likewise. We also find that that object is adequately expressed in the act's title. A general statement of the object is adequate, as all the details of a statute need not be set out in the statute's title, *People v Sowall,* 279 Mich 261, 266; 271 NW 751 (1937), and the act's title should be given a broad reading. *People v Denmark,* 74 Mich App 402; 254 NW2d 61 (1977).

Reversed and remanded to the trial court in accordance with this opinion.

M. F. CAVANAGH, P.J. *(dissenting).* I respectfully would dissent from the majority's decision to reverse the trial court's suppression of the evidence in this case.

Although defendant lacks standing to challenge the search of Seaver's house on Fourth Amendment grounds, I recognize that courts have the power and duty to exclude on due process grounds evidence obtained by means which are shocking to the conscience. *Rochin v California,* 342 US 165, 172; 72 S Ct 205; 96 L Ed 2d 183 (1952). When

police embark upon a purposeful illegality that results in obtaining relevant evidence, courts should not sanction that conduct by admitting such evidence at trial. Thus, if a defendant can establish that an illegal search is more than an innocent or negligent mistake and that the police acted in purposeful disregard of the law with the deliberate intention of building a case against the defendant, the trial court should exclude any product of such illegal action as a matter of public policy. and as a deterrence to future illegal action by the police.

In the instant case it cannot be determined from the record whether such misconduct occurred in the search of defendant's car and the search of the Seaver house. Did Officer Szilagyi "invent" the story that he saw a glassine package containing white powder in order to justify issuance of a warrant to search, or did he honestly but erroneously believe that he saw what he described? This question can only be answered by determining the credibility of the witnesses involved. The trial court alone should make this determination after it has the benefit of testimony.

Accordingly, I would remand this cause to the trial court. On remand, the trial court should apply the standard set forth in *Franks v Delaware,* 438 US 154; 98 S Ct 2674; 57 L Ed 2d 667 (1978), to determine whether the police officer's statement that he saw defendant carrying a glassine bag containing a white powdery substance was a "deliberate falsehood or reckless disregard of the truth" in light of the fact that such a bag was never found in subsequent searches of defendant's person and his automobile. If that statement is found to be invalid, all evidence seized after the statement was made, including the defendant's

identity and prior Florida arrest, should be suppressed.

Likewise, if defendant establishes a purposeful illegality, the fruits of the search of the Seaver home, including the cocaine and narcotic paraphernalia seized therein, and Seaver's testimony under grant of immunity should be suppressed.

I also am concerned that the stop of the defendant's automobile by the state police trooper was simply a pretext stop used to obtain defendant's identification and any other available information. This court was presented with no evidence which would substantiate the state police officer's statement that the defendant made an illegal turn. No citation was issued to the defendant. The stop was made after authorities who had been observing the Seaver home and the defendant's activities and movements radioed the state police that they wanted the defendant identified. I do not believe that the *Terry-Whalen* investigatory search and seizure of defendant's identification was reasonable under the facts and circumstances known by police at the time of the automobile stop. Defendant's identity was sought by police, and they used a specious traffic stop to discover that information. *Terry* and *Whalen* should not be expanded to permit such police activity.

I would remand for a *Franks* hearing in accordance with this opinion.